**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------- x

PENGUIN GROUP (USA) INC.,                        :

                      Plaintiff-Counterclaim        :
                      Defendant,

                                     :

      -against-                                      :    **No. 06-cv-2438 (RO)**

THOMAS STEINBECK,                                :    **ECF CASE**

                      Defendant-Counterclaim
                      Plaintiff,                         :

BLAKE SMYLE,                                     :

                      Defendant                        :

---------------------------------------------------------------------- x

**MEMORANDUM OF LAW OF PLAINTIFF AND COUNTERCLAIM DEFENDANT**
**PENGUIN GROUP (USA) INC. IN OPPOSITION TO COUNTERCLAIM**
**PLAINTIFF THOMAS STEINBECK'S MOTION FOR SUMMARY JUDGMENT**

Richard Dannay (RD-9407)
Thomas Kjellberg (TK-0605)
COWAN, LIEBOWITZ & LATMAN, P.C.
1133 Avenue of the Americas
New York, N.Y. 10036-6799
Phone (212) 790-9200
Attorneys for Plaintiff-Counterclaim
Defendant

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

I.   Facts ...................................................................................................................... 1

II.  The Parties' Contractual Undertaking to Negotiate in Good Faith is an Enforceable
     Obligation under New York Law .......................................................................... 6

     A.   The "Agreement to Agree" Case Law Cited by Thom Does Not Apply ..................... 6

     B.   A Contractual Undertaking to Negotiate in Good Faith is an Enforceable Obligation
          under New York Law ...................................................................................... 8

     C.   An Additional Advance in the Amount of the Oprah "Excess Earnings" is Financially
          Unfeasible Under the 1994 Agreement. ............................................................ 14

     D.   Thomas Steinbeck Has Not Yet Negotiated in Good Faith; He Has Not Negotiated at
          All ............................................................................................................ 15

     E.   Thomas Steinbeck's Argument that His Contractual Agreement to Negotiate in Good
          Faith Applies Only Prospectively Is Meritless. .................................................... 16

     F.   The Parties' Commitment to Negotiate in Good Faith Cannot Be Construed as
          Illusory ...................................................................................................... 18

     G.   Failing to Negotiate for Two Years Does Not "Exhaust" A Contractual Obligation to
          Negotiate in Good Faith ................................................................................. 20

CONCLUSION ................................................................................................................ 21

22159/021/770892.5

## TABLE OF AUTHORITIES

**Cases**

*180 Water St. Associates, L.P. v. Lehman Bros. Holdings, Inc.*, 7 A.D.3d 316, 776 N.Y.S.2d 278 (1st Dep't 2004) ................................................................. 10

*Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc*, 145 F.3d 543 (2d Cir. 1998) ........... 10

*American Broadcasting Cos. v. Wolf*, 52 N.Y.2d 394, 438 N.Y.S.2d 482 (1981) ............................................................................................................... 7, 8

*Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69 (2d Cir. 1989) ........... 10

*Brown v. Cara*, 420 F.3d 148 (2d Cir. 2005) ................................................. 10, 15

*Candid Prods., Inc. v. International Skating Union*, 530 F. Supp. 1330 (S.D.N.Y. 1982) ................................................................................................ 7, 8

*CanWest Global Communications Corp. v. Mirkaei Tikshoret Ltd.*, 9 Misc. 3d 845; 804 N.Y.S.2d 549 (Sup. Ct. N.Y. County 2005) ................................. 10, 16

*DeLaurentis v. Cinematografica de las Americas, S.A.*, 9 N.Y.2d 503, 215 N.Y.S.2d 60 (1961) ................................................................................... 15

*Einhorn v. Mergatroyd Prods.*, 426 F. Supp. 2d 189 (S.D.N.Y. 2006) ................ 11

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712 (S.D.N.Y. 1989) ................................................................................................................. 7, 15

*Jillcy Film Enterprises, Inc. v. Home Box Office, Inc.*, 593 F. Supp. 515 (S.D.N.Y. 1984) ............................................................................................ 7, 8

*Kass v. Kass*, 91 N.Y.2d 554, 673 N.Y.S.2d 350 (1998) ...................................... 17

*Klauber Bros., Inc. v. Westchester Lace, Inc.*, 1989 U.S. Dist. LEXIS 3169 (S.D.N.Y. 1989) ................................................................................................. 19

*Kleinschmidt Div. of SCM Corp. v. Futuronics Corp.*, 41 N.Y.2d 972; 395 N.Y.S.2d 151 (1977) ........................................................................................ 9

*Martin Delicatessen v. Schumacher*, 52 N.Y.2d 105, 436 N.Y.S.2d 247 (1981) ............. 6, 8, 9

*Matter of Friedman*, 64 A.D.2d 70 407 N.Y.S.2d 999 (2d Dep't 1978) ................ 18

*Network Enters. v. APBA Offshore Prods.*, 427 F. Supp. 2d 463 (S.D.N.Y. 2006) ..................................................................................................... 11, 15, 16

*Paper Corp. of the United States v. Schoeller Technical Papers, Inc.*, 807 F. Supp. 337 (S.D.N.Y. 1992) .................................................................................. 1

*Richbell Info. Servs. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 765 N.Y.S.2d 575 (1st Dep't 2003) ........................................................................................ 10

*Rosoff v. Mt. Laurel Ctr. for the Performing Arts*, 317 F. Supp. 2d 493 (S.D.N.Y. 2004) ................................................................................................. 9

22159/021/770892.5

*SNC, Ltd. v. Kamine Eng'g & Mech. Contr. Co.*, 238 A.D.2d 146, 655 N.Y.S.2d 47 (1st Dep't 1997) ............................................. 10

*Sylvan Crest Sand & Gravel Co. v. United States*, 150 F.2d 642 (2d Cir. 1945) .................. 19

*Teachers Ins. & Annuity Ass'n of America v. Tribune Co.*, 670 F. Supp. 491 (S.D.N.Y. 1987), *appeal dismissed*, 816 F.2d 670 (2d Cir. 1987) ....................... 8, 9, 10, 13

*Teachers Ins. & Annuity Ass'n v. Butler*, 626 F. Supp. 1229 (S.D.N.Y. 1987), *appeal dismissed*, 816 F.2d 670 (2d Cir. 1987) ................................................. 8

*Village Nursing Home v. Axelrod*, 146 A.D.2d 382 541 N.Y.S.2d 377 (1st Dep't 1989) ..................................................................................................... 18

*Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200 (2d Cir. 2002) ......................... 7, 10

*William C. Atwater & Co., Inc. v. Panama R.R. Co.*, 246 N.Y. 519 (1927) ......................... 18

*Wood v. Lady Duff-Gordon*, 222 N.Y. 88 (1917) ................................................. 15

## Other Authorities

Black's Law Dictionary (5th ed. 1979) ............................................................ 19, 20

Merriam-Webster's Collegiate Dictionary (10th ed. 1997) .................................... 16

## Treatises

Joseph M. Perillo & Helen H. Bender, *Corbin on Contracts* (Rev. ed. 1995, 2002 Supp.) ...................................................................................... 19

## INTRODUCTION

To establish a claim for breach of contract under New York law, a plaintiff must prove: (1) that an agreement existed between it and defendant; (2) what the obligations of the parties were; (3) that the plaintiff performed its obligations under the agreement; (4) that the defendant breached the agreement by failing to perform its obligations; and (5) that the plaintiff suffered damages as a result of the breach. *Paper Corp. of the United States v. Schoeller Technical Papers, Inc.*, 807 F. Supp. 337, 341 (S.D.N.Y. 1992).

Counterclaim Plaintiff Thomas Steinbeck, acting through his exclusive agent McIntosh & Otis, Inc., has not fulfilled his obligations under the contractual provision he claims Penguin has breached; accordingly, his motion for summary judgment must be denied.

## I.    Facts

On October 24, 1994 Penguin's predecessor Viking Penguin entered into a publishing agreement with Elaine Steinbeck and Thomas Steinbeck with respect to 18 later works of John Steinbeck, including *East of Eden* (the "1994 Agreement"). Complaint Exhibit A; Steinbeck Decl. Exhibit 1. In the 1994 Agreement Elaine Steinbeck and Thomas Steinbeck are listed as "c/o McIntosh & Otis, Inc.," their literary agent, and their listed address is that of McIntosh & Otis. The 1994 Agreement provides further that "all sums of money due under this agreement shall be paid to the Author's agent, McIntosh & Otis, Inc.," and that "the said McIntosh & Otis, Inc. is hereby empowered by the Author to act in all matters arising from and pertaining to this agreement." 1994 Agreement, Paragraph 14A.

The 1994 Agreement provides for annual guaranteed advances to be made to Thomas Steinbeck and Elaine Steinbeck, ranging from $214,500 in the first year to $165,000 for the seventh and subsequent years.  Beginning in the seventh year, the annual guaranteed advances are adjusted upward based on increases in the National Consumer Price Index.  The annual advances are "guaranteed" in that each year's advance is paid whether the prior year's advance has been earned or not.  1994 Agreement, Paragraph 7.

The 1994 Agreement provides further that

> The guaranteed advance shall also be adjusted annually so that if, in any year, the earnings payable to the Author exceed the guaranteed advance for that year ("excess earnings"), the amount of the guaranteed advance for the following year only shall be restated by adding a sum equal to the excess earnings from the preceding year to the guaranteed advance.  The annual guaranteed advance shall not be adjusted downward for any shortfall by operation of this paragraph.

*Id.*

Annual guaranteed advances under the Agreement were meant to even out year-to-year variations and provide a steady stream of royalty income to Thomas Steinbeck and Elaine Steinbeck.  Declaration of Karen R. Mayer ("Mayer Decl.") ¶ 5.  Under the same provision of the 1994 Agreement the parties also agreed that

> If at any time the Publisher determines that payment of the annual guarantee is not economically feasible for Publisher to continue, the Publisher and Author agree to negotiate in good faith as to a reduced annual guarantee.

1994 Agreement, Paragraph 14A.

From 1996 to 2001, the "excess earnings" that were included in the calculation of the next year's annual guaranteed advance ranged from zero to a high of approximately

2

$138,000.  2002, the centennial year of John Steinbeck's birth, produced "excess earnings" of just under $300,000.   Mayer Decl. ¶ 7.

In May 2003 *East of Eden* was chosen to be the first selection of the revived Oprah's Book Club for the 2003-04 broadcast season.  In negotiations with McIntosh & Otis in connection with the Oprah's Book Club selection, Penguin proposed, and put into effect, substantial royalty increases for various John Steinbeck titles, including an increased royalty on the Oprah edition of *East of Eden* from 10% to 11%; and an increase to 10% of the paperback royalty on all John Steinbeck titles that were at 8% under the 1994 Agreement. The 1994 Agreement was not formally amended to reflect these increased royalties. However, they were reflected in the royalty statements issued by Penguin beginning in October 2003.  Mayer Decl. ¶¶ 8-9.

The designation of *East of Eden* as an Oprah's Book Club selection resulted in sales that were in an entirely different universe than, and indeed dwarfed, historical sales of that title.  From 1996-2002 average annual net unit sales of *East of Eden* were approximately 34,000.  In 2003 net unit sales were over 1,800,000—50 times higher.  In 2004 net sales, counting returns, were just over 3,000 copies.  Mayer Decl. ¶ 10.  More copies of *East of Eden* were sold in five months after the Oprah's Book Club designation than in the 51 years since its first publication.  Counting returns, approximately 1,750,000 copies of the Oprah edition were sold through September 2006.  Mayer Decl. ¶ 11.

All royalties due to Thom Steinbeck under the 1994 Agreement, including all royalties for the Oprah edition of *East of Eden*, at the increased rate Penguin unilaterally put into effect in 2003, have been paid to Thom Steinbeck's exclusive agent under the 1994 Agreement, McIntosh & Otis, Inc.  Royalty earnings totaling $2,888,810.59 from the Oprah

edition of East of Eden were credited to the proprietors' royalty account, Thom's share of which was one-third, or $926,936.83.  As a result, since the publication of the Oprah edition of East of Eden, Thom Steinbeck has received royalties of over $880,000 (less agent's commission) under the 1994 Agreement, separate and apart from his share of annual guarantees.  Mayer Decl. ¶ 12.

The "excess earnings" advance at issue here is a separate matter from royalties.  The "guaranteed advances" under the 1994 Agreement are just that—advances.  Thom Steinbeck has not been deprived of any royalties as a result of the non-inclusion of the 2003 Oprah "excess earnings" in the 2004 guaranteed advance.  Mayer Decl. ¶ 12.

The 2004 advance paid to Thom Steinbeck excluded only "excess earnings" from the "Oprah edition" of *East of Eden*.  All other "excess earnings" from 2003 were included. They were significant; the Oprah's Book Club designation positively affected sales of all John Steinbeck titles in 2003, resulting in guaranteed advances for 2004 which, despite the exclusion of the "Oprah edition" excess earnings from the calculation, were substantially higher than in prior years (excluding 2003, which captured earnings from the 2002 John Steinbeck centennial).  The annual advance paid to Thomas Steinbeck in 2004 ($151,963.94) included over $95,000 in "excess earnings" from 2003 sales.  Mayer Decl. ¶ 16.

"Excess earnings" from the extraordinarily successful Oprah edition of *East of Eden*—the amount by which those earnings exceeded the annual guaranteed advance for 2003—were of course extraordinary.  If an amount equal to those "excess earnings" were added to the 2004 advance, together with the ongoing obligation to pay annual guaranteed advances it would take decades to recoup the 2004 advance from royalties, and it might never be recouped.  The result of including the "excess earnings" from the Oprah edition of

4

*East of Eden* in the annual guarantee would be in effect a windfall double royalty payment rather than an advance contemplated by the 1994 Agreement.  Mayer Decl. ¶ 13.

That result was "not economically feasible" for the publisher under the 1994 Agreement, and in 2004 Penguin issued to McIntosh & Otis accounting statements that excluded the "excess earnings" from the Oprah edition of *East of Eden* from the calculation of the 2004 annual guaranteed advance.  Mayer Decl. ¶¶ 13-15.  In June 2004, Penguin made a proposal to Thom Steinbeck through his exclusive agent McIntosh & Otis, under which Penguin would substantially increase the royalty rates on all John Steinbeck titles, along with the royalty increases already in effect, and a substantially increased royalty guarantee for 2004, 2005 and 2006.  Mayer Decl. ¶ 17.

On several occasions in late 2004 Penguin discussed with McIntosh & Otis the exclusion of the Oprah edition royalties from the calculation of the 2004 guaranteed advance as an annual advance that was "not economically feasible" for Penguin.  Mayer Decl. ¶¶ 13, 20-24.  In response McIntosh & Otis simply "reserved all rights" with regard to the 2004 advance, and deposited the 2004 advance checks "without prejudice" to the copyright proprietor's rights to receive an additional advance payment.  However, Thom Steinbeck's agent McIntosh & Otis never accepted, rejected, counterproposed, or otherwise negotiated with respect to Penguin's proposal—already partly in effect—to increase royalties across the board on all John Steinbeck works, except for continuing to accept the increased royalties Penguin unilaterally put into effect in 2003.  Mayer Decl. ¶¶ 21-23.

Penguin heard nothing else from McIntosh & Otis regarding its proposal with respect to the 2004 advance until June 2006—after the filing of the present counterclaim—when McIntosh & Otis requested that Penguin consider resolving Thom Steinbeck's claim for a

5

2004 "Oprah advance" for what McIntosh and Otis calculated to be the full "Oprah advance" due to Thom, $810,000, plus interest.  Mayer Decl. ¶ 24.  McIntosh & Otis's June 2006 proposal was not a good faith negotiation.  It was not a negotiation at all, but simply a demand that the "Oprah advance" be paid in full, without even an allowance for the increased royalties Penguin had been paying since 2003.  McIntosh & Otis did not respond to Penguin's invitation to negotiate further.  Mayer Decl. ¶¶ 24-25.

Thomas Steinbeck's assertion that "Penguin's inaction made it necessary for Thom to file a counterclaim for breach of contract," Br. 6, is wrong on the facts and the law.  It is Thom's "inaction"—or that of his agent McIntosh & Otis—that is in breach of the parties' obligation to negotiate in good faith under the 1994 Agreement.

## II.     The Parties' Contractual Undertaking to Negotiate in Good Faith is an Enforceable Obligation under New York Law

Thom is wrong that Paragraph 7 of the 1994 Agreement is an unenforceable "agreement to agree" under New York law.  Thom's argument is based on a line of cases applying *Martin Delicatessen v. Schumacher*, 52 N.Y.2d 105, 436 N.Y.S.2d 247 (1981), in which the New York Court of Appeals held that a renewal provision in a lease was unenforceable for indefiniteness because the price, a material term, was left open for future resolution.  Thom cites the wrong law.

### A.     The "Agreement to Agree" Case Law Cited by Thom Does Not Apply

The *Martin Delicatessen* line of cases does not apply here.  The 1994 Agreement, in contrast to the preliminary-stage "agreements to agree" in *Martin Delicatessen* and its progeny, is a valid and fully enforceable contract under which Thom and Penguin have performed and taken the benefit for 12 years.  There is no question that in Paragraph 7 of the

6

1994 Agreement the parties explicitly bound themselves, not to agree, but to "negotiate in good faith as to a reduced annual guarantee."  As Judge Mukasey has explained, the cases cited by Thom—*Candid Prods., Inc. v. International Skating Union*, 530 F. Supp. 1330 (S.D.N.Y. 1982) (Weinfeld, J.), and *Jillcy Film Enterprises, Inc. v. Home Box Office, Inc.*, 593 F. Supp. 515 (S.D.N.Y. 1984), which follows *Candid Prods.*—deal with an altogether different situation than the case at bar:

> those cases deal with the so-called "agreement to agree," which is less an agreement than a stage of negotiations and which courts refuse to recognize as imposing limitations and obligations—i.e., which courts often refuse to recognize as a contract.  *See Candid Prods.*, 530 F. Supp. at 1334-35.  We deal here with a fully enforceable contract with complete provisions on all essential subjects.

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712, 739 (S.D.N.Y. 1989); *see also Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 216 (2d Cir. 2002) ("As a general matter, if the cases that establish a particular legal principle are factually distinguishable in a material respect from the case at bar, then that principle is not … clearly applicable.").

Thus, in *American Broadcasting Cos. v. Wolf*, 52 N.Y.2d 394, 438 N.Y.S.2d 482 (1981), the New York Court of Appeals found that sportscaster Warner Wolf breached his contractual obligation to "enter into good faith negotiations" during a 45-day period by making a contract with another network.  While equitable relief was not available, *inter alia*, because the contract was for Wolf's personal services,

> This is not to say that ABC has not been damaged in some fashion or that Wolf should escape responsibility for the breach of his good-faith negotiation obligation.  Rather, we merely conclude that ABC is not entitled to equitable relief.  … [H]owever, this decision is without prejudice to ABC's right to pursue relief in the form of monetary damages, if it be so advised.

7

*Wolf*, 438 N.Y.S.2d at 488.  *See also Teachers Ins. & Annuity Ass'n v. Butler*, 626 F. Supp.

1229, 1235 (S.D.N.Y. 1987) (Weinfeld, J.) (holding that the defendants' refusal to negotiate

open terms after entry into a binding commitment letter was a breach of their "implied duty

of good faith negotiation" as well as their express agreement "to abide by all matters

pertaining to the due execution of documents that Teachers' attorneys found 'reasonably

necessary for the transaction.'"), *appeal dismissed*, 816 F.2d 670 (2d Cir. 1987).

> **B.    A Contractual Undertaking to Negotiate in Good Faith is an Enforceable Obligation under New York Law**

Moreover, subsequent to *Martin Delicatessen*, *Candid Prods.* and *Jillcy*, New York

courts and federal courts applying New York law have consistently held that a commitment

to negotiate in good faith is enforceable, even in the context of a preliminary contract, if the

parties manifest their intent to be bound to that commitment.  Here, Thom makes no claim

that he is not bound by the 1994 Agreement—only that his contractual commitment to

negotiate in good faith is unenforceable or illusory.  Clearly it is neither.

The seminal case, *Teachers Ins. & Annuity Ass'n of America v. Tribune Co.*, 670 F.

Supp. 491 (S.D.N.Y. 1987) (Leval, J.), *appeal dismissed*, 816 F.2d 670 (2d Cir. 1987)

("*TIAA*"), recognized that an agreement "that expresses mutual commitment to a contract on

agreed major terms, while recognizing the existence of open terms that remain to be

negotiated" is binding under New York law.  *Id*. at 498.  Thus, while

> [i]t often is said that the failure to agree on all essential terms precludes
> the formation of a contract[, a]s Judge Leval pointed out in *Teachers
> Ins. & Annuity Ass'n v. Tribune Co.*, this statement perhaps is overly
> broad, at least as respects New York.  Where parties reach agreement
> on major terms, leaving others for further negotiation, *and* intend to be
> bound by the preliminary agreement, a contract is formed.

8

*Rosoff v. Mt. Laurel Ctr. for the Performing Arts*, 317 F. Supp. 2d 493,497 (S.D.N.Y. 2004)

(Kaplan, J.) (citing *Martin Delicatessen*, 436 N.Y.S.2d at 249).  *See also*, *e.g.*, *Kleinschmidt*

*Div. of SCM Corp. v. Futuronics Corp.*, 41 N.Y.2d 972; 395 N.Y.S.2d 151 (1977) (UCC

case) ("It is no longer true that dispute over material terms inevitably prevents formation of a

binding contract.  What is true ... is that when a dispute over material terms manifests a lack

of intention to contract, no contract results.").

 Under New York law,

> parties can bind themselves to a concededly incomplete agreement in
> the sense that they accept a mutual commitment to negotiate together in
> good faith in an effort to reach final agreement within the scope that
> has been settled in the preliminary agreement. … [T]his sort of
> preliminary agreement … might be referred to as a binding preliminary
> commitment.

*TIAA*, 670 F. Supp. at 498.  Such a binding preliminary commitment

> does not commit the parties to their ultimate contractual objective but
> rather to the *obligation to negotiate the open issues in good faith* in an
> attempt to reach the alternate objective within the agreed framework.

*Id*. (emphasis added).  A party to such a commitment may not demand performance of the

ultimate transaction; "[w]hat he may demand, however, is that his counterparty negotiate the

open terms in good faith toward a final contract incorporating the agreed terms."  *Id*.  *TIAA*

and its numerous progeny thus debunk the interpretation of *Martin Delicatessen* urged by

Thom.  As Judge Leval noted, "To consider the existence of open terms as fatal would be to

rule, in effect, that binding preliminary commitments cannot be enforced.  That is not the

law."  *Id*. at 499.  The binding preliminary commitment in *TIAA*

> obligated both sides to seek to conclude a final loan agreement upon
> the agreed terms by negotiating in good faith to resolve such additional
> terms as are customary in such agreements.

*Id*.  Thus the defendant in *TIAA* "undertook a binding commitment to negotiate open terms in good faith and breached that commitment."  *Id*. at 508.  Thom is equally bound by his commitment in the 1994 Agreement to negotiate in good faith as to a reduced guaranteed advance.

 *TIAA* has been adopted by New York courts.  *See*, *e.g.*, *CanWest Global Communications Corp. v. Mirkaei Tikshoret Ltd.*, 9 Misc. 3d 845; 804 N.Y.S.2d 549 (Sup. Ct. N.Y. County 2005) ("agreements to negotiate in good faith in an effort to reach a final agreement within a certain scope of terms are enforceable") (citing *TIAA*); *SNC, Ltd. v. Kamine Eng'g & Mech. Contr. Co.*, 238 A.D.2d 146, 655 N.Y.S.2d 47, 48 (1st Dep't 1997) ("There are issues of fact as to whether plaintiff and the Owner defendants reached a binding preliminary contract giving rise to a duty to negotiate in good faith, and, if so, whether the Owner defendants breached it.") (citing *TIAA*); *Richbell Info. Servs. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 765 N.Y.S.2d 575 (1st Dep't 2003); *180 Water St. Associates, L.P. v. Lehman Bros. Holdings, Inc.*, 7 A.D.3d 316, 776 N.Y.S.2d 278, 279 (1st Dep't 2004) (recognizing "a cause of action for breach of an agreement to negotiate").

 Federal courts in the Second Circuit applying New York law have likewise adopted *TIAA*'s principle that a contractual commitment to negotiate in good faith is binding and enforceable.  *See*, *e.g.*, *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69 (2d Cir. 1989); *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc*, 145 F.3d 543, 548 (2d Cir. 1998) (such an agreement "does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the … objective within the agreed framework."); *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200 (2d Cir. 2002); *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005) ("We agree that

the MOU does not bind the parties to complete the Jay Street Project but disagree insofar as the District Court found that the MOU does not bind the parties to negotiate in good faith open terms …"); 159 ("Defendants' contention that enforcement of the MOU as a … preliminary agreement is barred by the New York Statute of Frauds … is without merit. … We hold that the MOU is a Type II preliminary agreement binding the parties to negotiate in good faith terms necessary to pursue joint development of the Jay Street Property.  We remand for further proceedings consistent with this holding."); *Einhorn v. Mergatroyd Prods.*, 426 F. Supp. 2d 189, 194 (S.D.N.Y. 2006).

A contract commitment to negotiate in good faith is anything but unenforceable, as Thom urges.  Indeed, reliance damages and even consequential damages may be awarded for its breach.  Recently, in *Network Enters. v. APBA Offshore Prods.*, 427 F. Supp. 2d 463 (S.D.N.Y. 2006), Judge Haight found that the plaintiff, a cable network, and defendants, a production company and its chairman, "entered into a binding Type II preliminary agreement which obligated them to negotiate in good faith the number, dates and times of the 2001 season telecasts." *Id*. at 485.  However, "not only did [the corporate defendant] fail to negotiate these terms in good faith, it failed and refused to negotiate them at all." *Id*.  The Court found that the defendant company's chairman "was either unaware of the contractual obligation to negotiate open terms in good faith generated by a Type II preliminary agreement, as articulated by the Second Circuit in cases construing the governing New York law, or he chose to disregard that obligation." *Id*. at 486.

Accordingly, "[t]he corporate defendant's breach of its contractual obligation to negotiate in good faith the open terms within the framework of the 2001 programming is manifest." *Id*. at 486-87.  The Court acknowledged that with agreements of this type "the

11

calculation of damages caused by a breach may in some circumstances be problematical. But the calculation is simple enough in the case at bar."  Based on the parties' submissions Judge Haight "conclude[d] without difficulty that if [defendant] had negotiated in good faith with [plaintiff], the dates and times of at least ten 2001 weekend telecasts would have been agreed upon.  It follows that Network has proved damages in the total amount of $400,000 resulting from defendant's breach of its obligation to negotiate in good faith."  *Id*. at 487.

The cases Thom cites are readily distinguishable, for the parties never bound themselves to negotiate in good faith.  *Clifford R. Gray, Inc. v. Le Chase Constr. Servs., LLC*, 31 A.D.3d 983, 819 N.Y.S.2d 182 (3d Dep't 2006), Br. 7, involved an alleged oral "exclusivity agreement" between the defendant general contractor and the subcontractor plaintiff, under which the parties allegedly were to enter into a subcontract for electrical work on a construction project if the general contractor was awarded the prime contract.  The claimed agreement "was never reduced to writing, nor did the parties execute a subcontract," and the plaintiff conceded "that the parties never fully agreed on the details of a subcontract and agreed only that the outstanding details of the subcontract would be discussed if defendants were ultimately awarded the [construction] contract" in question.  819 N.Y.S.2d at 184.

The plaintiff in *Clifford R. Gray, Inc.* did not claim breach, or seek performance, of a contractual commitment to negotiate in good faith.  Instead it sought damages for breach of the theoretical subcontract plaintiff claimed it should have been awarded pursuant to the alleged oral exclusivity agreement.  *Id*. ("Plaintiff … commenced this action, seeking damages for lost profits and other revenues it would have earned if it had been given the subcontract").  The Court's finding that the alleged oral exclusivity agreement, "as defined

12

by plaintiff," would be "merely an agreement to later agree upon the precise nature of the work to be subcontracted, price and manner of payment and time of performance," *id*. at 185 (internal quotation marks omitted), has no relevance to the clear contractual commitment to negotiate in good faith here, which Thom does not claim to have performed.

In *Yan's Video, Inc. v. Hong Kong TV Video Programs, Inc.*, 133 A.D.2d 575, 520 N.Y.S.2d 143 (1st Dep't 1987), Br. 8, the plaintiff, a video retail establishment, sued for breach of contract when the defendant refused to negotiate a renewal of a licensing agreement for Chinese-language videos.  In *Yan's Video* there was no "binding commitment to negotiate … in good faith," *TIAA*, 670 F. Supp. at 508, like the one that appears in the 1994 Agreement here.  Instead, the Court found, the expired licensing agreement that had been "proffered by [defendant] HK-TVP simply set forth HK-TVP's intention to negotiate in good faith a renewal 'upon terms and conditions to be negotiated.'"  *Yan's Video*, 520 N.Y.S.2d at 144.

And again, the *Yan's Video* plaintiff did not claim breach, or seek to compel performance, of a binding commitment to negotiate in good faith.  Instead it sought its "ultimate contractual objective," *TIAA*, 670 F. Supp. at 498—a renewed license—and the trial court granted it, in the form of injunctive relief requiring the defendant to "furnish plaintiffs with new tapes pursuant to the terms and conditions of their expired sub-licenses." *Yan's Video*, 520 N.Y.S.2d at 144.  The Appellate Division's reversal in *Yan's Video* has no relevance to the enforceability of Thom's binding commitment, set forth in Paragraph 7 of the 1994 Agreement, to negotiate in good faith as to a reduced annual guarantee.

### C.   An Additional Advance in the Amount of the Oprah "Excess Earnings" is Financially Unfeasible Under the 1994 Agreement.

The 2003 Oprah bonanza resulted in net sales of over 1,800,000 copies, or 50 times greater than the prior average.  Mayer Decl. ¶ 10.  If the phenomenal "excess earnings"—"earnings payable to the Author [that] exceed the guaranteed advance"—in 2003 were included in calculating the 2004 advance, that single annual advance, together with Penguin's continuing obligation under the 1994 Agreement to pay yearly advances of $165,000 a year (adjusted upward), would put Penguin in the position of being unable to recoup the compounded advances from royalties for decades—if ever.  Mayer Decl. ¶ 13.  If during that time Penguin were to lose rights to any works covered by the Agreement, there would be fewer royalties earned from which to recoup the advances.  In that case the Oprah-augmented "excess earnings" would not be an advance contemplated by the Agreement, but instead a windfall double royalty.

The Oprah-edition "excess earnings" are clearly an extraordinary event not foreseeable by anyone, and a potentially never recouped 2004 annual "advance" in the amount of those excess earnings is not "economically feasible" for Penguin to pay.[1]

---

[1] It is, indeed, so extraordinary and unforeseeable a contingency that it would invoke the doctrine of commercial impracticability.  The commercial impracticability doctrine is invoked to excuse a party from strict performance of a contract "'if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made.'"  *Asphalt International, Inc. v. Enterprise Shipping Corp., S.A.*, 667 F.2d 261, 266 n.4 (2d Cir. 1981) (quoting U.C.C. § 2-615(a)); *see generally* Restatement (Second) of Contracts § 261:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

*Footnote continued on following page*

**D.      Thomas Steinbeck Has Not Yet Negotiated in Good Faith; He Has Not Negotiated at All**

A party's performance of its obligation to negotiate in good faith is a question of fact. *Brown*, 420 F.3d at 157 ("Whether the differences that have terminated the parties' working relationship in this case reflect good faith is a question for the District Court on remand."); *In re Gulf Oil*, 725 F. Supp. at 739 ("To the extent that defendants are arguing that courts cannot second-guess negotiating tactics, they are incorrect.  Courts are often called upon to determine whether a party negotiated in good faith."); *see Network Enters.*, 427 F. Supp. 2d at 485.  New York courts have long found the standard of "good faith" to be sufficiently definite in connection with performance.  *See, e.g.*, *DeLaurentis v. Cinematografica de las Americas*, *S.A.*, 9 N.Y.2d 503, 215 N.Y.S.2d 60 (1961) (enforcing a written contract where the parties agreed to make a good faith effort to create a story outline "acceptable to both"); *Wood v. Lady Duff-Gordon*, 222 N.Y. 88 (1917) (implication of good faith read into every

---

As the Second Circuit held in *American Trading & Production Corp. v. Shell International Marine Ltd.*, 453 F.2d 939, 942 (2d Cir. 1972), "American law recognizes that performance is rendered impossible if it can only be accomplished with extreme and unreasonable difficulty, expense, injury or loss."  Moreover, "it is now recognized that a thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable when it can only be done at an excessive and unreasonable cost." *Transatlantic Financing Corp. v. United States*, 363 F.2d 312, 315 (D.C. Cir. 1966); *see* Restatement of Contracts § 454 ("Impossibility means not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved.").

The cost, potentially never recouped, of an annual advance to Thom increased by the amount of the Oprah "excess earnings" is well beyond the threshold of extreme and unreasonable.  *See, e.g.*, *American Trading*, 453 F.2d at 942 ("The Restatement gives some examples of what is 'extreme and unreasonable'—Restatement of Contracts § 460, Illus. 2 (tenfold increase in costs) and Illus. 3 (costs multiplied fifty times)").

The commercial impracticability doctrine need not be considered here, since Thom has not complied with the obligation to negotiate in good faith under the 1994 Agreement.

15

contract); *CanWest*, 804 N.Y.S.2d at 570 ("The submissions herein sufficiently demonstrate, for purposes of injunctive relief inquiry, that MTG breached its duty to negotiate in good faith by drastically altering the terms of the June and November Agreements.").

Thom's own submissions on his motion show entirely one-sided dealings with respect to the "Oprah advance."  Thom has not yet negotiated in good faith, and indeed he has not negotiated at all.  In simply passively rejecting Penguin's proposals for alternate arrangements, without comment or counterproposal, Thom (or his agent) has not yet begun to fulfill his enforceable contractual commitment to "negotiate in good faith as to a reduced guarantee."  *See*, *e.g.*, Merriam-Webster's Collegiate Dictionary (10th ed. 1997) (defining "negotiate" as "to arrange for or bring about through conference, discussion, and compromise"); *Network Enters.*, 427 F. Supp. 2d at 485 (finding breach where defendant "failed and refused to negotiate [outstanding terms] at all").

There is no merit to Thom Steinbeck's contention that he has negotiated at all, much less negotiated in good faith.  At a minimum, the activities of Thom Steinbeck and his agent disclose issues of fact, warranting denial of his motion.

### E.      Thomas Steinbeck's Argument that His Contractual Agreement to Negotiate in Good Faith Applies Only Prospectively Is Meritless

Thom's argument that "Paragraph 7's 'negotiations' provision … by its plain language … would only apply prospectively," Br. 10—i.e., to future annual advances—is wrong as a matter of "plain language."  It overlooks the "plain language" of the provision, as well as its purpose and context:  the parties agreed that if *at any time* the publisher determines that payment of the annual guarantee is not economically feasible, they would negotiate in good faith as to a reduced annual guarantee.  The fact that Penguin may make

16

that determination "at any time" shows that the parties' obligation to negotiate applies to the current advance, and not just to future advances.

The case law quotations and dictionary definitions of "continue" that Thom cites, Br. 11, do not support (as a matter of "plain language" or otherwise) the illogical position that "continue" means that the parties agreed to negotiate—in good faith—only as to a reduced annual guarantee for a year *after* the year that gives rise to the need to negotiate.  Under Thom's theory the 1994 Agreement would provide an obligation to negotiate that is pointless, for it could not possibly alleviate the "economic unfeasibility" it is intended to alleviate.

Paragraph 7 provides that an amount equal to the "excess earnings" paid to Thom in any year is to be added to the guaranteed advance *for the following year only*.  Further, if "at any time" Penguin "determines that payment of the annual guarantee is not economically feasible … to continue," Thom and Penguin are to negotiate in good faith "as to a reduced annual guarantee."  Under Thom's interpretation, however, any such "reduced annual guarantee" could only be for some year *after* the one for which it is needed.  In essence, Thom's theory is that the provision makes no sense.

To so construe a contract provision as senseless is improper under New York law. *Kass v. Kass*, 91 N.Y.2d 554, 673 N.Y.S.2d 350 (1998) ("courts 'should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed.  Particular words should be considered, not as if isolated from the context, but in light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought.'") (quoting *William C. Atwater & Co., Inc. v. Panama R.R. Co.*, 246 N.Y. 519, 524

17

(1927)); *Village Nursing Home v. Axelrod*, 146 A.D.2d 382 541 N.Y.S.2d 377, 382 (1ˢᵗ Dep't 1989) ("In construing a contract, the agreement is to be read as a whole and every part will be interpreted with the whole in seeking to give each clause its intended purpose in the promotion of the primary and dominant purpose of the contract.").

As the Court held in *Matter of Friedman*, 64 A.D.2d 70, 407 N.Y.S.2d 999 (2d Dep't 1978),

> Parties to an agreement are presumed to act sensibly … and an interpretation that produces an absurdly harsh result is to be avoided. Since there exists, in every contract, an implied covenant of good faith and fair dealing, the courts may take into consideration the fact that one construction would make the contract unreasonable. Thus courts will endeavor to give the construction most equitable to both parties instead of one which will give one of the parties an unfair or unreasonable advantage over the other.")

407 N.Y.S.2d at 1006 (internal citations and quotations omitted). Thom's take on "continue" in light of Paragraph 7's adding the "excess earnings" only once, would mean that the good-faith-negotiation obligation would alleviate only a future problem that may never occur, and would ignore the one problem that did arise. Such a strained and nonsensical interpretation is to be rejected as a matter of law. At a minimum, Thom's argument that the parties committed themselves to a meaningless duty to "negotiate in good faith" gives rise to a fact issue that precludes Thom's summary judgment motion.

**F.    The Parties' Commitment to Negotiate in Good Faith Cannot Be Construed as Illusory**

In claiming his contractual obligation to "negotiate in good faith as to a lower advance" is unenforceable, or "only applies prospectively," Thom in effect asks the Court to interpret his bargained-for contractual undertaking as illusory. An "illusory promise" is

> a purported promise that actually promises nothing because it leaves to
> the speaker the choice of performance or nonperformance.  When a
> promise is illusory, there is no actual requirement upon the promisor
> that anything be done because promisor has an alternative which, if
> taken, will render promisee nothing.  When provisions of supposed
> promise leave promisor's performance optional or entirely within
> discretion, pleasure and control of promisor, the promise is illusory.

*Klauber Bros., Inc. v. Westchester Lace, Inc.*, 1989 U.S. Dist. LEXIS 3169, *10 (S.D.N.Y.

1989) (quoting Black's Law Dictionary (5th ed. 1979)).  *See* 2 Joseph M. Perillo & Helen H.

Bender, *Corbin on Contracts* § 5.28, at 412-13 (Rev. ed. 1995, 2002 Supp.) ("An Illusory

Promise is Not Sufficient Consideration") ("If what appears to be a promise is an illusion,

there is no promise.  Like the mirage of the desert with its vision of flowing water which yet

lets the traveler die of thirst, there is nothing there.  By the phrase 'illusory promise' is meant

words in promissory form that promise nothing.").

Courts are loath to find contract promises illusory; accordingly, the longstanding rule

is that "[i]n construing [a contract] the presumption should be indulged that both parties were

acting in good faith."  *Sylvan Crest Sand & Gravel Co. v. United States*, 150 F.2d 642, 643

(2d Cir. 1945).  Specifically, "[t]he words should be so construed as to support the contract

and not render illusory the promises of both parties."  *Id*. at 644.   Thom's arguments that his

bargained-for commitment to negotiate in good faith is unenforceable, or alternatively is

meaningless, because it "applies only prospectively," are at heart an argument that he "pulled

a fast one," and gave up nothing in the bargain.  As such they must be rejected.

### G.   Failing to Negotiate for Two Years Does Not "Exhaust" A Contractual Obligation to Negotiate in Good Faith

Thom's argument, *ipse dixit*, that his contractual obligation to negotiate in good faith is "exhausted" by the passage of time and his own inaction, Br. 13, must fail.  The issue is whether Thom has engaged in good faith negotiations—not how long he has not negotiated.

Thom's various references to "two years of negotiations," Br. 13; "two years of unsuccessful negotiations," Br. 2; and "almost two years of such negotiations," Br. 5, are unsupported and factually incorrect.  As shown above, Thom has not "negotiated" at all, either on his own account or through his literary agent, McIntosh & Otis; *see* Black's Law Dictionary (5th ed. 1979) (defining "negotiate" as "To transact business; to bargain with another respecting a transaction; to conduct negotiations or conferences with a view to reaching a settlement or agreement. … To communicate or confer with another so as to arrive at the settlement of some matter.  To meet with another so as to arrive through discussion at some kind of agreement or compromise about something.").

Thom's agent's laconic "reservations of rights" and acceptance of the 2004 advance "without prejudice" in late 2004, and acceptance of unilaterally increased royalties, and silence and inaction thereafter, do not comprise negotiation in any sense, much less the "good faith negotiation" Thom is obligated to undertake under the 1994 Agreement.  In failing even to respond to Penguin's proposals, much less to make any counterproposal of his own, Thomas Steinbeck has plainly failed to perform his contractual obligation.  In those circumstances the lack of agreement for any period time is irrelevant.

## CONCLUSION

For the reasons given above, Defendant-Counterclaim Plaintiff Thomas Steinbeck's

motion for summary judgment should be denied.

Dated:   New York, New York
       December 1, 2006

                                      Respectfully submitted,

                                      _s/ Richard Dannay_

                                      Richard Dannay (RD-9407)
                                      Thomas Kjellberg (TK-0605)
                                      COWAN, LIEBOWITZ & LATMAN, P.C.
                                      1133 Avenue of the Americas
                                      New York, New York 10036-6799
                                      (212) 790-9200
                                      Attorneys for Plaintiff-Counterclaim
                                      Defendant Penguin Group (USA) Inc.

21